RONAN v. 155,453 FEET OF LUMBER et al.

(District Court, E. D. New York. January 8, 1904.)

1. SHIPPING—LIGHTERAGE OF CARGO—DEMURRAGE.

A steamship line contracted to carry a cargo of lumber to New York, and deliver it at any point directed, within the lighterage limits of the port. The owner directed a part of it delivered to a shipyard on Staten Island, which was outside the limits; and the carrier employed libelant's barge to make such delivery, charging the owner of the lumber with the cost of the extra towage. The barge, with all the lumber loaded thereon, was unable to get up to the dock at which lumber was delivered at the shipyard, and, the consignee declining to receive it elsewhere, she lay several days waiting until a part was taken off onto another boat. Both the steamship company and libelant knew the condition of the dock, and that

¶ 1. Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

the barge would certainly, or at least probably, be unable to reach it with the load placed on her, and it was verbally agreed between them that the company should not be liable for demurrage. *Held*, that the delay was due to the action of the steamship company and libelant in knowingly placing such a load on the barge that she probably could not reach the dock, and they could not cast the burden of their negligence on either the shipper or the consignee, and that libelant could not recover the demurrage from the steamship company, because of their agreement.

2. SAME.

A memorandum or writing delivered by the steamship company to the master of the barge after the lumber had been loaded thereon, apparently to be signed by the consignee and returned as a receipt, and which contained incomplete provisions with respect to demurrage for delay after the barge was "ready to deliver," but was not signed by either the steamship company or libelant, would not exclude proof of the parol agreement between them in that respect; nor could libelant claim that the barge was ready to deliver, when she could not reach the dock, as he knew she could not when the cargo was loaded.

In Admiralty. Suit to recover demurrage.

Peter S. Carter, for libelant.

Frank B. Sturges, for Burlee Dry Dock Co.

Edward L. Owen, for Vanderbilt.

Butler, Notman, Joline & Mynderse (Mr. Thacher, of counsel), for New York & Texas S. S. Co.

THOMAS, District Judge. Vanderbilt employed the Mallory Line (New York & Texas Steamship Company), for a stipulated through freight, to carry 239,000 feet of lumber to New York, and to deliver the same at any point directed, within the lighterage limits of the port. The shipper directed the carrier to deliver 155,453 feet of such lumber to the Burlee Dry Dock Company, whose place of business is on Staten Island. The Mallory Line employed Ronan, libelant, to make such delivery, and transshipped the lumber to the libelant's barge Herbert, and thereupon gave the master of the Herbert the following instrument (the description of the lumber is omitted, and the name of the Burlee Company was thereafter affixed):

"MALLORY LINE.
"(N. Y. & T. S. S. CO.)
"From Steamship San M
"Consignee Burlee Dry Dock
"At Port Richmond, S. I.
"One hundred & fifty-five thousand
  six hundred & forty-three
(155,643) feet L W

"Voy. No. 3   New York ——————— 190
"Received by Lighter. . .....................
    from Mallory Line (N. Y. & T. S. S. Co.)
    the freight described hereon in good or-
    der on board:
    ........................................
"Sign here
        "Burlee Dry Dock Co.,
                        "Leslie.

"Unless discharged within the prescribed lay days; demurrage will be charged in accordance with the rules of the New York Produce Exchange, as follows:

"Rule 3. On parcels of merchandise of one hundred and fifty tons and over, on any one lighter or barge, the day on which the lighter or barge is ready to deliver and the two following working days (ending at 6 o'clock p. m. of the last day without regard to weather), shall be deemed lay days without charge. Parcels of merchandise under one hundred and fifty tons shall be allowed one day less.

"Rule 4. Demurrage at the rate of ten dollars per day may be charged on parcels of merchandise of fifty tons and under, on any one lighter or barge; fifteen dollars per day on parcels of over fifty tons and not exceeding one hundred tons; and twenty dollars per day on parcels of over one hundred tons.

"Rule 5. All extra towage incurred by order of merchant or employers in making a change in destination, or in making more than one delivery, shall be at the expense of the party so ordering."

When the lumber was reported to the Burlee Dry Dock Company, it was found that the excessive draft of the Herbert precluded unloading at the dock in Bodine's creek, where lumber usually was delivered to that company. There followed a delay from March 24th to April 3d, when the Mallory Line, at the request of Ronan's agent, sent down another boat to relieve the Herbera of something of her burden, and thereby allow her to get up to the dock in the creek, where she finished discharging on April 9th. Ronan brought suit against the Burlee Company for demurrage, the Burlee Company brought in Vanderbilt, and the latter brought in the Mallory Company. Is any demurrage due, and, if so, who should pay it?

Ronan and the Mallory Company contracted by parol for the Herbert's service before the writing was delivered, and stipulated that the latter should pay no demurrage for detention at the Burlee dock. This special exemption arose from the fact that both parties knew that there was difficulty expectable there in making delivery by the one vessel carrying such an amount of lumber. The Mallory Line stipulated to deliver within the lighterage limits. These limits were established by the Mallory Line, and Vanderbilt knew the extent of the carrier's obligation in that regard. Vanderbilt knew that Burlee's dock was without the lighterage limits, and that the expense of towing beyond the established lighterage limits would fall upon him; and, when the bill of $8 for such towage was presented to him by the Mallory Line, he paid the same, while the Mallory Line bore the expense of $1 per thousand feet for the services of the Herbert in carrying the lumber to the lighterage limits. Thus, as between Vanderbilt and the Mallory Line, the latter was not obliged, by its primary contract of shipping, to deliver at Burlee's dock. But now observe what Ronan and the Mallory Line did. The Mallory Line continued its service as carrier to the lighterage limits, and thereupon assumed a new obligation of towage beyond those limits for purposes of delivery at the dock. Both Ronan and the Mallory Line knew, or should have known, that the towage service could not be effected by the Herbert with the burden put upon her. The matter was discussed between them, so that, if Ronan did not know, he was warned, that there was risk, and that he must assume it. Notwithstanding this, Ronan received a cargo that could not be delivered, and which, as between himself and the Mallory Line, he verbally agreed to deliver at his own risk, and from the consequences of which, both before and after the service, he ab-

solved the Mallory Line. The question now discussed is not whether the parol agreement was merged in the writing above, but whether, in addition to presumed knowledge of conditions at Burlee's dock, Ronan and t..e Mallory Line did not actually know that the service could not be performed in the manner undertaken. If so, they had no right to attempt the service at the risk of Vanderbilt. He had a right to expect that the Mallory Line, while charging him for towage services, would employ a suitable vessel, fittingly loaded, to carry the lumber to a dock whose limitations the Mallory Line well knew from experience. Instead of this, the Mallory Line sent a vessel so heavily burdened that the towage could not be finished until she was later re-lieved of a portion of her load by the Mallory Line, which line now seeks to cast the consequences of its imprudent action upon the ship-per. The facts are made so plain by the evidence offered by the Mallory Line that it would be inequitable to permit it to recover from an innocent shipper damages which it thus incurred. Mallory owed Vanderbilt the duty of lightering or towing with ordinary foresight, and it is of no consequence that Mallory employed Ronan, for, as between Mallory and Vanderbilt, the services were performed by Mallory. Ronan knew what the Mallory Line knew of the condition at Burlee's dock, and, with the information of the embarrassments fully in mind, assumed the service. Hence Vanderbilt is under no liability either to Ronan or the Mallory Line. So, also, as between the Mallory Line and Ronan, the former should be acquitted. Both entered with full knowledge into an impracticable undertaking. Both constructively and actually knew that the service could not be performed, and ar-ranged that the Mallory Line should not be holden. Ronan's agent, Myers, who made the contract with the Mallory Line, testified that he agreed that the Mallory Line should not be held for this demurrage; and Ronan, verbally and by letter, confirmed such exemption after the question of liability arose. In fact, as late as April 16th, Ronan wrote Mallory as follows:

"We do not see why you should worry about this matter as your contract ceased when the lighter Herbert reported to the Burlee Dry Dock Co. They (B. D. D. Co.), being unable to furnish her a berth to discharge her lumber, which caused the delay, and we are therefore holding the lumber for our charges."

Here is an interpretation of the contract by Ronan himself. This was after the libel had been filed against the Burlee Company, and after the alleged breach of duty. But the libelant, in the face of this evi-dence, is understood to assert that the writing, improperly called a "bill of lading" (The Delaware, 81 U. S. 600, 20 L. Ed. 779), binds the Mallory Line for these demurrage charges. The circumstances under which the writing was given are imperfectly presented, but it would appear that it was handed to the captain of the Herbert, who was not a witness, after the delivery of the cargo to the Herbert. It is not shown to have been signed either by the master or agent of the Herbert. Printed at the head are the words "Mallory Line," underneath "N. Y. & T. S. S. Co.," and at the end appear two capital letters. What they are—whether the initials of the captain or some agent of the Mallory Line, or neither—does not appear. It is inferable that the paper is on

a form used by the Mallory Line. Hence, so far as it purports to embody the agreement between Ronan and the Mallory Line, the assent of the Mallory Line to its terms may be inferred. Saunderson v. Jackson, 3 Esp. 180 (2 B. & P. 238); Schneider v. Norris, 2 M. & S. 286. In fact, it was an incomplete memorandum, probably handed to the master of the Herbert for the purpose of showing the shipment and the consignee, and was intended to be signed by the Burlee Company upon receipt of the cargo, and thereupon returned to Mallory; thereby operating as evidence that Ronan had carried and delivered the goods, and that the consignee had received them. It may be used as evidence of the agreement, but, at least so far as it is incomplete, it does not preclude other parol evidence thereof (Renard v. Sampson, 12 N. Y. 561; Routledge v. Worthington Co., 119 N. Y. 592, 23 N. E. 1111; Barker v. Bradley, 42 N. Y. 316, 319, 1 Am. Rep. 521; Potter v. Hopkins, 25 Wend. 417; Juilliard v. Chaffee, 92 N. Y. 529), unless the law implies obligations that may not be shown by extrinsic evidence to have been waived (The Delaware, 81 U. S. 579, 20 L. Ed. 779).

In the case at bar, while the writing contains printed matter, that, "unless discharged within the prescribed lay days, demurrage will be charged in accordance with the rules of the New York Produce Exchange," yet rule 3, incorporated in the writing, only defines what shall be included in lay days, and rule 4 prescribes the daily compensation for delay. But it will be observed that the Herbert was not "ready to deliver," according to the rule incorporated in the writing, nor were any lay days prescribed in the writing. The Herbert was not ready, because she could not reach the place of delivery. Whose fault was that? Her owner knew that she could not be "ready to deliver" when he took the cargo. The Herbert was lightering a carrying ship that could not reach Burlee's dock to make delivery. The very purpose of using the Herbert was that she might reach a point that the ship could not reach. But shall the lighter be heard to say that her draft was too great to reach the dock and be ready for delivery, and that she could lie sluggishly outside and hold the freighter for indefinite delay? When there is added to this the lighter's knowledge that she could not be ready to make the delivery, or that there was risk that she could not, and that, in anticipation of the danger, she agreed that the carrier should not be liable for injury flowing from the conditions which disabled the lighter from readiness to deliver, upon what theory of justice or law can the carrier be held therefor, and how is the fragmentary writing produced the best evidence of the agreement between the parties? It is concluded that the libelant's attitude is not tenable.

The remaining question is whether the Burlee Company is liable for demurrage. It will be observed that the Herbert waited from March 24th, the date of its arrival at the vicinity of the Burlee dock, to April 3d, before her load was lightered, although she learned at once upon her arrival that she could not discharge on account of the draft. After learning this, it would seem that she should have procured relief within a reasonable time, and then demanded from the Burlee Company such damages as arose from any default on its part. The evidence tends to show that, after the Mallory Line sent a barge to lighten the load of the Herbert, the work was done in a day and a half.

King, the agent of the Mallory Line, states that, the day after the Herbert arrived at Burlee's dock, he heard from Mr. Myers, Ronan's agent, that there was trouble, but that the latter did not ask for help. He testified that Mr. Myers said:

"There wasn't enough water go up the slip, and they were trying to get Burlee to put some overboard, and then let the boat go up, and he would let me know in a day or two what they did, and I heard in three days after that. * * * He told me Ronan had sent Mr. Vanderbilt down there, and he could get no satisfaction. * * * Next time he came up to the office, and he wanted to know if we couldn't do something to get the boat light; he had another load for her; Burlee was willing to do nothing—wouldn't let them put it overboard or do anything, in fact. Q. That is the time you sent the Hitchcock down there? A. Yes, sir."

Myers testified:

"Q. Please state the conversation you had with Mr. King when you found the Herbert, after arrival, couldn't discharge at Burlee's dry dock? A. The barge had been there seven or eight days, and the captain reported to me the lumber was in danger of sliding off the boat, the way she listed, with the bank on one side. I called up Mr. King, and told him there was no use trying to deliver the lumber; they wouldn't receive it; I was going to put it in storage; it was in danger of sliding off the barge, and the barge was being delayed; it was very expensive. Q. Did you ask him to assist you in the discharge of it? A. I don't remember asking him to assist me. Q. How long after the barge first arrived there, on the 24th of March, did you notify Mr. King you were not discharging the cargo? A. I believe, within a day or two after the barge arrived there, and we found we couldn't get to the dock; there wasn't sufficient water."

All this shows little diligence on the part of the Herbert. But it is urged on the part of the libelant that, although there was not sufficient water to go up to the dock by entering the Bodine creek, yet the cargo could have been lightened by the use of the barge's boom, whereby certain of the cargo could have been swung onto Dock B. Myers, Ronan's agent, states:

"That barge could swing 30 to 40 feet. It is a 65-foot boom, and could easily swing from 30 to 40 feet."

The water for 15 feet in front of Dock B was too shallow, but the suggestion on the trial is that the barge might have been brought up alongside the outer limit of the shallow part, and the lumber carried thus over on to the dock. Leslie, representing the Burlee Company, testified that the undertaking would have been dangerous, and that he did not think that it was practicable. If he had consented to it, assuming that his consent was asked, and there had been an accident to the barge, claim would have been made against the Burlee Company for insufficient dockage facility, and the claim would have been based upon its agreement to allow the discharge to take place at that point. However, the evidence shows the situation, and what happened. Conklin, Ronan's agent, testified that, when the barge Herbert arrived—

"I asked him [Leslie] where he was going to put that lumber, and he mentioned to put it in the mouth of the creek, where that other lumber was. I told him the boat wouldn't float in there; there wasn't water enough. He said he knew that, and he would have to get it there somehow or other; and we pulled in as close as we could. We couldn't get up there. There was a place to the end of the dock at the end of the bulkhead [meaning Dock B] that I thought we might take part off. * * * What did he say when you said you might take part of your cargo off at that place? A. He said 'No.' I

can't remember the exact words, but he give me to understand he wouldn't have it there; that he wanted it in the mouth of the creek. Q. Could the Herbert have gone to the place marked 'B' at the bulkhead and discharged part of her cargo? A. Part of her cargo; yes, sir. Q. What was the idea of your having her go to the place B on the diagram, at the bulkhead, to discharge part of the cargo? A. So as to take off part, and she would float in the creek, and we would thereby save several days' time. Q. Would Mr. Leslie allow you? A. He would not allow it. Q. So you did what? A. Waited until they sent a lighter to take some off. Q. That lightened up the Herbert, and you went into the creek? A. Yes, sir. Q. There would have been no difficulty with your barge, if she did lie aground at B, to discharge, would there? A. No, sir. Q. And the lumber that was eventually discharged from the Herbert on the dock at this creek, did it extend anywhere towards the bulkhead marked 'B'? A. Yes, sir."

Here is no suggestion of swinging the lumber across some indefinite space by use of the boom.

Upon cross-examination this witness stated that at the time he had the bow 30 feet from the corner of the bulkhead, and then:

"Q. What was the nearest you got the bow of the lighter to the bulkhead? A. To the front of the bulkhead? 30 feet. Q. What was the nearest the stern was at that time? A. Oh, further. I don't know how far."

He further states that he did not swing the stern around, because Leslie didn't want the stuff there. Leslie stated:

"I don't remember any conversation of that kind at all. We had some talk about the difference, but I don't remember that."

It further appears that that was not the place for the delivery of the lumber; that that portion of the dock was used for other purposes —that is, for boat building, and not for receiving lumber. Leslie testified: That Conklin came and told him that one of his boats was coming down there with 150,000 feet of lumber. "I said, 'How much water is she drawing?' I think he said, '9 or 10 feet.' I said, 'You know as well as I do she will never go up the creek.' We talked quite a little while, and I said: 'It can't possibly be she has 150,000 feet for us. If she has any for any one else, she better go take it off first'— and talked that way, of course. But he knew the creek just as well as I did, and knew she couldn't get up there." That a barge was discharging in the creek, and that the Herbert did not go on the bulkhead marked "B," but on the bulkhead that is marked "A." That at the southerly corner of the bulkhead marked "B" there was only 3 feet of water at high tide. That the bulkhead, running from south to north, was about 175 feet. That "we build our boats there, and launch them over there, and I presume there were boats building. I couldn't tell you just that day." That the reason he did not discharge at B was because it was too shallow. That the water at B is about 6 feet at high water, with a little more at the northerly corner. That where the water is 3 feet it is entirely dry at low water, and that along B it would be about 2 feet at low water, and about 7 feet at high water. That no yellow pine had been discharged, except in the creek, for three years. That a light cargo of lumber was discharged at the west end of B.

It is concluded that the Burlee Company was under no obligation to consent to the delivery of the lumber at an unaccustomed, inconvenient place, nor to consent to an attempt to deliver the lumber at a point in

front of Dock B, where it would be dangerous to allow the Herbert to lie. Conklin's theory upon the trial was that he would have swung the vessel around so that she might lie out at this distance, and discharge on a dock devoted to boat building. The fact is that the Herbert was sent there with such draft that she could not discharge in the usual way, and at the proper place, and Conklin's suggestion was that some unusual way and place might be adopted to discharge a portion of the load at a place where it did not belong. Even if there were no danger in it, and even if the Burlee Company might, in a spirit of undemandable helpfulness, have allowed the attempt to be made, at the risk of disturbing its boatbuilding, and at the inconvenience of receiving the lumber where it was not usually delivered, and from which place it must be removed, and at the risk of being charged with negligence if injury arose from the low water, it was not obliged to enter into such arrangement. It was in fact not obliged to make any experiments for the purpose of lifting Ronan and the Mallory Line—one or both—out of difficulty which they had, with full knowledge, brought upon themselves.

It is therefore concluded that the libel should be dismissed as to all the parties.